IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| RIVER COMMUNITY BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:14-cv-00048 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BANK OF NORTH CAROLINA, | ) | By: Hon. Jackson L. Kiser |
| Successor by merger to KEYSOURCE | ) | Senior United States District Judge |
| COMMERCIAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff River Community Bank, N.A. ("River") originally filed this action in the Circuit Court for the City of Martinsville. Defendant Bank of North Carolina ("BNC") then removed the action to this Court on October 24, 2014 (see Not. of Removal, Oct. 14, 2014 [ECF No. 1]), and promptly filed a Motion to Dismiss for Lack of Personal Jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the alternative, Motion to Transfer. (See Mot. to Dismiss, Oct. 31, 2014 [ECF No. 11].) The parties fully briefed the issues and appeared in open court on December 9, 2014, to argue their respective positions. I have reviewed the arguments of counsel, the relevant affidavits, and the applicable law. For the reasons stated herein, BNC's Motion to Dismiss will be denied.

I. **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

Plaintiff River Community Bank, N.A. ("River"), is a national banking association with its principal place of business in Martinsville, Virginia. (Compl. ¶ 1 [ECF No. 1-1].) [1]

---

[1] The facts are taken from Plaintiff's Complaint. As this stage, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Because I am ruling on BNC's motion to dismiss for lack of personal jurisdiction without the benefit of an evidentiary hearing, I "assume the credibility of [River's] version of the facts, and . . . construe any conflicting facts in the
*(continued)*

Defendant Bank of North Carolina ("BNC") is a North Carolina state-chartered bank with its principal place of business in High Point, North Carolina. (Id. ¶ 2.) KeySource Commercial Bank ("KeySource") was a North Carolina state-chartered bank located in Durham, North Carolina. (Id. ¶ 3.) By virtue of a merger, BNC acquired KeySource on September 14, 2012, and became KeySource's successor in interest. (Id. ¶ 4.)

In 2009, representatives of KeySource called River and inquired whether River would be interested in acquiring an interest in a $3,800,000.00 loan issued by KeySource to Piedmont Center Investments, LLC ("Piedmont"). (Id. ¶ 6.) KeySource forwarded background information regarding the loan to River at its offices in Virginia. (See Decl. of Ronald Haley ¶ 2, Nov. 13, 2014 [ECF No. 16-2].) After several rounds of negotiation and an initial refusal to participate by River,[2] River ultimately purchased a 31.5789% interest in the loan to Piedmont. (Compl. ¶ 6.) KeySource executed two copies of a Loan Participation Agreement ("the Agreement") in North Carolina and sent those executed copies to River in Virginia. (See Decl. of Tonya Carter ¶ 9, Nov. 13, 2014 [ECF No. 16-1].) River executed its copies of the Agreement at its offices in Virginia and returned one copy to KeySource in North Carolina. (See Carter Decl. ¶¶ 9–10.)

The loan to Piedmont was secured with real estate located in Mebane, N.C.; specifically, a shopping mall. (Compl. ¶ 10.) One of the tenants was an entity partially owned by Timothy J.

---

parties' affidavits and declarations in the light most favorable to [River]." Universal Leather, LLC v. Koro AR, S.A., Case No. 13-2241, slip op. at 13 (4th Cir. Dec. 8, 2014) (citing Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003)).

[2] According to Ronald Haley, the President and CEO of River, after River initially refused the offer to participation in the loan, the former President and CEO of KeySource, Don Draughton, personally called Haley and urged him to have River "reconsider its decision." (Haley Decl. ¶ 3.) "After, and because of, this conversation, River Bank reviewed the proposed loan participation agreement again, and ultimately decided to enter into the Loan Participation Agreement with KeySource and to purchase a participation interest in the loan to Piedmont Center Investments, LLC." (Id. ¶ 4.)

Buckley ("Buckley").  (Id.)  A written guaranty purportedly signed by Buckley was used to guarantee rent to Piedmont ("the Guaranty").  (Id.)  The Guaranty was assigned to KeySource as further security for the loan to Piedmont.  (Id. ¶ 13.)

As part of the Agreement between KeySource and River, KeySource represented and warranted that "the Loan Documents were validly executed by Borrower and, where applicable, any Guarantor under the Loan," and that KeySource "has taken, will take, and will continue to take whatever additional actions may be necessary and proper to validly perfect and maintain a Security Interest in the Collateral securing the Loan."  (Id. ¶ 7.)  River relied on KeySource's representations in the Agreement in deciding to purchase an interest in the loan to Piedmont.  (Id. ¶ 8.)  River ultimately delivered $1,200,000.00 to KeySource for its interest in the loan.  (Id.)

In actuality, Buckley's signatures on both the Guaranty and the Assignment of the Guaranty were not Buckley's signatures, but were forgeries by Roger Camp ("Camp"), an owner of Piedmont.  (Id. ¶ 16.)

Camp was ultimately indicted for bank fraud in June of 2011 due, in part, to his role in fraudulently inducing KeySource to issue the loan to Piedmont.  (Id. ¶ 19–21.)  Shortly thereafter, Piedmont filed a voluntary petition for bankruptcy.  (Id. ¶ 22.)  KeySource was permitted to move forward with a foreclosure on the shopping mall in Mebane.  (Id. ¶ 23.)  Around this time, BNC completed its merger with KeySource, making BNC the only remaining entity.  After a year on the market, BNC was only able to secure a buyer for the shopping mall at a sales price of $1,000,000.00, an amount substantially less than the loan balance owed by Piedmont.  (Id. ¶ 28–31.)  The contract for the sale of the property did not provide for an allocation of the proceeds between the real property and the business personal property located

on the real property. (Id. ¶ 32.) BNC acquired the business personal property located on the Piedmont site through settlement with another lender for $200,000.00. (Id. ¶ 33.)

Without consultation with River, BNC allocated $200,00.00 from the proceeds of the sale to the business personal property. (Id. ¶ 34.) "In doing so, [BNC] attempted to ensure that it would be fully reimbursed for its purchase of the business personal property while at the same time reducing the amount that River Bank would be owed from the sale proceeds based on [River's] percentage participation in the loan." (Id.) After deducting BNC's fees, expenses, and allocation of $200,000.00 of the sale proceeds to the business personal property, River received $89,387.85. (Id. ¶ 35.) As of March 2014, River is still owed $1,409,464.46 for its share of the loan. (Id. ¶ 26.)

In the three-year period from January 1, 2007, until December 31, 2009, River participated in loans made by KeySource on no less than ten occasions, including the Loan Participation Agreement at issue in this case, and paid KeySource more than $4,000,000.00. (Carter Decl. ¶ 4.) On each of those ten occasions, KeySource approached River about participating in the loans. (Id. ¶ 5.) For all ten loan participations, KeySource directed River's payments to River in Virginia. (Id. ¶ 6.) "In this same period, KeySource . . . paid River [] $2,200,000.00 to purchase a participation interest in a line of credit that River [] extended to one of its customers." (Id. ¶ 4.)

On March 31, 2014, River filed suit against BNC, alleging that KeySource/BNC breached the warranties of the Agreement (Count I), and that BNC breach the implied covenant of good faith and fair dealing by unilaterally allocating the $200,000.00 purchase price of the business personal property (Count II). (See Compl. ¶¶ 40–49.) River also seeks attorney's fees and costs (Count III). (Id. ¶¶ 50-53.) On October 24, 2014, BNC removed the action to this

Court (see Not. of Removal, Oct. 24, 2014 [ECF No. 1]), and filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction or, in the alternative, motion to transfer on October 31, 2014. [ECF No. 11.]

## II. STANDARD OF REVIEW

When a defendant challenges a court's power to exercise personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citing Mylan Labs, Inc. v. Akzo, N.V., 2 F.3d 56, 59–60 (4th Cir. 1993)). When, as here, a district court is compelled to decide a pretrial jurisdictional challenge "on the basis of only motion papers, supporting legal memoranda[,] and the relevant allegations of a complaint" without conducting an evidentiary hearing, "the burden is on the plaintiff to make a *prima facie* showing" of personal jurisdiction. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). When making such a determination, a court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id.; see also Mylan Labs, Inc., 2 F.3d at 60. Although the standard to make a *prima facie* showing of personal jurisdiction is lenient, the court does not need to "credit conclusory allegations or draw farfetched inferences." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

## III. DISCUSSION

As a prerequisite to a suit, a court must have jurisdiction over the parties before it, known as personal jurisdiction. There are two types of personal jurisdiction: general and specific. General jurisdiction attaches when a defendant is shown to have had "continuous and

systematic" contacts with the forum. CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15 (4th Cir. 2009). "[T]he threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." ALS Scan, Inc v. Digital Serv. Consultants, Inc., 293 F.3d 707, 715 (4th Cir. 2002). Specific jurisdiction exists if a defendant's alleged liability arises from or is related to an activity conducted within the forum. Mitrano v. Hawes, 377 F.3d 402, 406−07 (4th Cir. 2004). When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation, while the "constitutional touchstone remains whether the defendant purposefully established minimum contacts with the forum State." Burger King Corp., 471 U.S. at 475.

A court, sitting in diversity, applies the long-arm statute of its home state. See CFA Inst., 551 F. 3d at 292. The Fourth Circuit has clarified the course a Virginia federal court should take when determining whether it may exercise personal jurisdiction over a defendant:

> A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause. If a potential exercise of jurisdiction comports with the state's long-arm statute, the Constitution "requires that the defendant have sufficient minimum contacts with the forum state." Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when Virginia is the forum state. A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process.

Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301 (4th Cir. 2012) (citing CFA Inst., 551 F.3d at 292–93). The relevant inquiry, then, is only whether the exercise of personal jurisdiction over BNC would comport with the Due Process Clause of the Fourteenth Amendment.

"[T]he Fourth Circuit has set out a three-part test in which the Court must consider, in order, '(1) the extent to which the defendant *purposefully availed* itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims *arise out of* those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be *constitutionally reasonable*.'" Hunt v. Calhoun Cnty. Bank, Inc., 8 F. Supp. 3d 720, 726–27 (E.D. Va. 2014) (quoting Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 279 (4th Cir. 2009)) (emphasis added). On the facts before the court, BNC has purposefully availed itself of the privilege of conducting activities in this state, River's claims arise out of activities directed at this state, and the exercise of personal jurisdiction would be constitutionally reasonable.

"The purposeful availment inquiry is grounded on the traditional due process concept of 'minimum contacts,' which itself is based on the premise that 'a corporation that enjoys the privilege of conducting business within the state bears the reciprocal obligation of answering to legal proceedings there.'" Universal Leather, LLC v. Koro AR, S.A., Case No. 13-2241, slip op. at 11 (4th Cir. Dec. 8, 2014) (quoting Tire Eng'g, 682 F.3d at 301). To determine whether a foreign defendant has purposefully availed itself of the privilege of conducting business in this state, I consider whether "the defendant's conduct and connection with the forum [s]tate are such that [it] should reasonably anticipate being haled into court []here." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989) (quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1980)).

"[C]ourts in the Fourth Circuit consider a variety of nonexclusive factors in determining whether a defendant as purposefully availed itself of the forum at issue," 5EI, LLC v. Take Action Media, Inc., Case No. 1:12cv492, 2012 WL 4105131, at *5 (E.D. Va. Sept. 17, 2012) (citing Consulting Eng'rs Corp., 561 F.3d at 278), and the inquiry is a "flexible" one that should

be considered on a case-by-case basis, Universal Leather, slip op. at 11 (quoting Tire Eng'g, 682 F.3d at 302). In the business context, these factors I may consider include, but are not limited to:

> (1) Whether BNC maintains offices or agents in Virginia;
> (2) Whether BNC owns property in Virginia;
> (3) Whether BNC reached into Virginia to solicit or initiate business;
> (4) Whether BNC deliberately engaged in significant or long-term business activities in Virginia;
> (5) Whether the parties agreed that the law of the forum state would govern disputes;
> (6) Whether BNC made in-person contact with the Virginia resident regarding the business relationship;
> (7) The nature, quality, and extent of the parties' communications about the business; and
> (8) Whether the performance of contractual duties was to occur within the forum.

See id. In this case, the facts are that BNC does not own any property, maintain any offices, employ any people, or pay any taxes in Virginia. The parties agreed that the law of North Carolina would govern the Agreement (see Compl. Ex. A pg. 3), and neither KeySource nor BNC nor any of its employees are alleged to have ever set foot in Virginia in connection with the Agreement.

While it is true that several factors weigh against finding that KeySource (and thus BNC) purposefully availed itself of the privilege of conducting business in Virginia, it is equally true that:

> (1) Over the last three years, BNC has reached into Virginia and solicited business totaling over $4,000,000.00:
> (2) BNC received $2,200,000.00 from River for an interest in a line of credit; and
> (3) Some of the contractual obligations were to be performed in Virginia; to wit, the payment to River of its share of the loan payments.

These facts establish that BNC engaged in significant and long-term business activities in Virginia.

Moreover, BNC reached into Virginia to solicit River's participation in the Loan Participation Agreement at issue in this case. The Agreement was signed, and thus became binding, in Virginia. The Agreement required that BNC pay River its share of any loan payments, which certainly had to occur in Virginia since that is where River is located and headquartered. (See Compl. Ex. A [ECF No. 1-1] ("Upon receipt of a payment . . ., Originating Institution [KeySource] will promptly pay to the Participant [River], in U.S. Dollars, an amount equal to the Participant's Participation Interest of each amount received and applied by the Originating Institution . . . .").) When these facts are coupled with the conclusion that BNC engaged in long-term and significant business activities in Virginia, I conclude that BNC purposefully availed itself of the privilege of conducting business in Virginia. Accord Universal Leather, slip op. at 15 ("When considered as a whole, Universal's allegations and supporting affidavits describe vigorous business solicitations undertaken by Koro in North Carolina, which gave rise to a two-year relationship between the parties that spanned a series of transactions and resulted in the sale of millions of dollars in goods.").

Turning to the second prong of the Due Process analysis, River's claims arise directly out of KeySource/BNC's activities directed at Virginia. "Where activity in the forum state is the genesis of the dispute, this prong is easily satisfied. A plaintiff's claims similarly arise out of activities directed at the forum state if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Tire Eng'g, 682 F.3d at 303. BNC's efforts to solicit and negotiate the Agreement is the genesis of the dispute. BNC reached into Virginia to solicit River's participation in a $3.8 million loan; BNC's alleged breach of the Agreement resulted in this lawsuit. Thus, BNC's actions directed at Virginia formed the genesis of the dispute, and the action arose out of BNC's activities directed

at the state.  Accord CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 295 (4th Cir. 2009) ("Simply put, the 1984 visit to the CFA Institute in Virginia was the genesis of this dispute.  The visit prompted the parties to enter into the License Agreement; ICFAI's subsequent infringement of the CFA Institute's rights under the License Agreement resulted in the Settlement Agreement (recognized by the Fourth Stipulation); and ICFAI's alleged breach of the Settlement Agreement resulted in this lawsuit.  Thus, the Reinstatement Stipulations show a seamless series of business transactions from ICFAI's 1984 Charlottesville visit to the filing of the Complaint.").

The final step in the Due Process analysis is to determine whether this Court's exercise of personal jurisdiction over BNC would be "constitutionally reasonable."  This analysis seeks to ensure that litigation in this Court is not "'so gravely difficult and inconvenient'" as to place the defendant at a "'severe disadvantage in comparison to his opponent.'"  Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  Additionally, at least three other relevant factors—the burden on BNC, the interests of Virginia as the forum state, and River's interests in obtaining relief—inform the "reasonableness" analysis.  See id. at 217 (citing Burger King, 471 U.S. at 475); see also CFA Inst., 551 F.3d at 296–97; Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 945–46 (4th Cir. 1994).[3]

The burden on BNC to litigate in this Court would be negligible.  The courthouse is less than sixty miles from BNC's main offices in High Point, North Carolina.  (See Compl. ¶ 2.)  By comparison, the federal courthouse in Greensboro is eleven miles away; the courthouse in

---

[3] Other factors which may be considered include, "the shared interest of the states in obtaining efficient resolution of disputes," and "the interests of the states in furthering substantive social policies."  Consulting Eng'g Corp., 561 F.3d at 279.  These factors apply with equal force to both Virginia and North Carolina and therefore do not warrant substantive discussion.

Winston-Salem is twenty miles away; and the Durham courthouse is sixty-three miles away.[4] All prospective witnesses are, presumably, subject to the subpoena powers of this Court. See Fed. R. Civ. P. 45(c)(1)(A).

Secondly, "Virginia has a valid interest in the resolution of the grievances of its citizens and businesses . . . ." CFA Inst., 551 F.3d at 297. The Fourth Circuit has long recognized that a plaintiff's home state has a "paternal interest in the recovery by one of its citizens of appropriate compensation, if there is a substantive cause of action." Lee v. Walworth Valve Co., 482 F.2d 297, 299–300 (4th Cir. 1973).

Finally, River "possesses a valid and substantial interest in having its legal rights recognized and vindicated." CFA Inst., 551 F.3d at 297. River is national banking association that serves the citizens of Virginia. It is imperative to its business structure and the security its customers' funds that it have and be afforded an opportunity "to utilize the judicial system in Virginia to protect and vindicate its . . . legal rights." Id.

Because all three factors of the Due Process inquiry are satisfied, BNC's motion to dismiss for lack of personal jurisdiction will be denied. That leaves BNC's alternative motion—a request to transfer this case to the Middle District of North Carolina.

"[I]n considering whether to transfer venue, a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." Bluestone Innovations, LLC v. LG Electronics, Inc., 940 F. Supp. 2d 310, 313 (E.D. Va. 2013). River concedes that it could have brought this case in the Middle District of North Carolina, so the only issue is whether a transfer to that jurisdiction is justified. With respect to this inquiry, "a district

---

[4] See Middle District of North Carolina, Court Locations, http://www.ncmd.uscourts.gov/court-info/court-locations (last visited Dec. 18, 2014).

court typically considers: (1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." Id. (internal quotations omitted).

For the reasons stated in the discussion on the burden on BNC to litigate in this forum and Virginia's interest in facilitating a resolution to River's claims, a transfer is not justified. The Western District of Virginia is Plaintiff's choice of forum, and that choice is entitled to "substantial weight." Id. at 314. There is no substantially greater hardship on litigating River's claims in this district than in BNC's home district. Moreover, a transfer would serve only to transfer the hardships associated with litigation from BNC to River, a fact that weighs heavily *against* a transfer. See JTH Tax, Inc. v. Lee, 482 F. Supp. 2d 731, 738 (E.D. Va. 2007) (holding that a transfer is "not appropriate where it would likely only serve to 'shift the balance of inconvenience' from the plaintiff to the defendant" (quoting Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp. 1253, 1259 (E.D. Va. 1988)).) There is scant evidence on the convenience of non-party witnesses to litigation in this Court but, as stated above, testifying here could be just equally as convenient as testifying in Durham, N.C. See, e.g., Samsung Elecs. Co., Ltd. v. Rambus, Inc., 386 F. Supp. 2d 708, 728 (E.D. Va. 2005) ("The convenience of *non-party witnesses* should be afforded greater weight in deciding a motion to transfer venue." (emphasis added)). Moreover, BNC "had not sufficiently explained why *de bene esse* depositions of nonparty witnesses outside the subpoena power would be inadequate . . . and why [BNC] would need their live testimony. Most civil trials feature some deposition testimony and this suit is not extraordinary in this regard." Acterna, LLC v. Adtech, Inc., 129 F. Supp. 2d 936, 939 (E.D. Va. 2001). Therefore, BNC's motion to transfer this case to the Middle District of Virginia will be denied as well.

## IV. CONCLUSION

Based on the facts adduced by River, the exercise of personal jurisdiction over BNC in this case comports with the Due Process Clause of the Fourteenth Amendment. As such, the long-arm statute of Virginia confers personal jurisdiction over BNC, and the motion to dismiss will be denied. The interests of justice and convenience of the parties do not require that this case be transferred to the Middle District of North Carolina, so that request will be denied as well.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 18th day of December, 2014.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE