IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| RIVER COMMUNITY BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:14-cv-00048 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BANK OF NORTH CAROLINA, | ) | By: Hon. Jackson L. Kiser |
| Successor by merger to KEYSOURCE | ) | Senior United States District Judge |
| COMMERCIAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Bank of North Carolina's Motion for Judgment on the Pleadings ("the Motion"). [ECF No. 28.] The matter was fully briefed by the parties [ECF Nos. 29, 30, 33], and I heard oral arguments on the Motion on June 11, 2015. For the reasons stated herein, Defendant's Motion will be granted. Because Plaintiff has moved for leave to file an amended Complaint, however, I will stay imposition of this ruling with regard to Count I of the Complaint until that matter has been resolved. (See Pl.'s Mot. to Amend/Correct Compl., June 9, 2015 [ECF No. 43].)

## I. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND[1]

Plaintiff River Community Bank, N.A. ("River"), is a national banking association with its principal place of business in Martinsville, Virginia. (Compl. ¶ 1 [ECF No. 1-1].) Defendant Bank of North Carolina ("BNC") is a North Carolina state-chartered bank with its principal place of business in High Point, North Carolina. (Id. ¶ 2.) KeySource Commercial Bank ("KeySource") was a North Carolina state-chartered bank located in Durham, North Carolina.

---

[1] The facts are taken from Plaintiff's Complaint. As this stage, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

(Id. ¶ 3.)  By virtue of a merger, BNC acquired KeySource on September 14, 2012, and became KeySource's successor in interest.  (Id. ¶ 4.)

In 2009, representatives of KeySource called River and inquired whether River would be interested in acquiring an interest in a $3,800,000.00 loan issued by KeySource to Piedmont Center Investments, LLC ("Piedmont").  (Id. ¶ 6.)  KeySource forwarded background information regarding the loan to River at its offices in Virginia.  (See Decl. of Ronald Haley ¶ 2, Nov. 13, 2014 [ECF No. 16-2].)  After several rounds of negotiation and an initial refusal to participate by River, River ultimately purchased a 31.5789% interest in the loan to Piedmont.  (Compl. ¶ 6.)  KeySource executed two copies of a Loan Participation Agreement ("the LPA") in North Carolina and sent those executed copies to River in Virginia.  (See Decl. of Tonya Carter ¶ 9, Nov. 13, 2014 [ECF No. 16-1].)  River executed its copies of the LPA at its offices in Virginia and returned one copy to KeySource in North Carolina.  (See Carter Decl. ¶¶ 9–10.)  The LPA was signed on August 6, 2009.  (Compl. Ex. A.)

The loan to Piedmont was secured with real estate located in Mebane, N.C.; specifically, a shopping mall.  (Compl. ¶ 10.)  One of the tenants was an entity partially owned by Timothy J. Buckley ("Buckley").  (Id.)  A written guaranty purportedly signed by Buckley was used to guarantee rent to Piedmont ("the Guaranty").  (Id.)  The Guaranty was assigned to KeySource as further security for the loan to Piedmont.  (Id. ¶ 13.)

As part of the agreement between KeySource and River, KeySource represented and warranted that "the Loan Documents were validly executed by Borrower and, where applicable, any Guarantor under the Loan," and that KeySource "has taken, will take, and will continue to take whatever additional actions may be necessary and proper to validly perfect and maintain a Security Interest in the Collateral securing the Loan" (hereinafter the "perfect-and-maintain warranty").  (Id. ¶ 7.)  River relied on KeySource's representations in the LPA in deciding to

purchase an interest in the loan to Piedmont.  (Id. ¶ 8.)  River ultimately delivered $1,200,000.00 to KeySource for its interest in the loan.  (Id.)

In actuality, Buckley's signatures on both the Guaranty and the Assignment of the Guaranty were not Buckley's signatures, but were forgeries by Roger Camp ("Camp"), an owner of Piedmont.  (Id. ¶ 16.)

Camp was ultimately indicted for bank fraud in June of 2011 due, in part, to his role in fraudulently inducing KeySource to issue the loan to Piedmont.  (Id. ¶ 19–21.)  Shortly thereafter, Piedmont filed a voluntary petition for bankruptcy.  (Id. ¶ 22.)  Around this time, BNC completed its merger with KeySource, making BNC the only remaining entity.

On March 31, 2014, River filed suit against BNC, alleging that KeySource/BNC breached the warranties of the Agreement (Count I), and seeking attorney's fees and costs (Count III).  (Id. ¶¶ 40–45, 50-53.)  On October 24, 2014, BNC removed the action to this Court (see Not. of Removal, Oct. 24, 2014 [ECF No. 1]), and filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction or, in the alternative, motion to transfer on October 31, 2014. [ECF No. 11.]  That motion was denied on December 18, 2014. (Order, Dec. 18, 2014 [ECF No. 22].)  On February 18, 2015, Defendant filed the present Motion for Partial Judgment on the Pleadings, pursuant to Rule 12(c).  [ECF No. 28.]  After mediation was unsuccessful (see Report of Settlement Conference, May 21, 2015 [ECF No. 41]), the motion was set for hearing on June 11, 2015.

II. **STANDARD OF REVIEW**

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . ."  FED. R. CIV. P. 12(c).  A motion under Rule 12(c) is reviewed under the same standards as a motion under Rule 12(b)(6).  See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).  The Sixth Circuit has advised:

> The standard of review for entry of judgment on the pleadings under Rule 12(c) is indistinguishable from the standard of review for dismissals based on failure to state a claim under Rule 12(b)(6); the difference between the two rules is simply the timing of the motion to dismiss. For a dismissal under Rule 12(b)(6), the moving party must request judgment in a pre-answer motion or in the answer itself, whereas a motion for dismissal under Rule 12(c) may be submitted after the answer has been filed.

Jackson v. Heh, Case No. 98-4420, 2000 WL 761807, at *3 (6th Cir. June 2, 2000) (per curiam) (unpublished). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 149. In determining facial plausibility, the Court must accept all factual allegations in the complaint as true. Id. at 1949. The Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the Complaint must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

"Although a motion pursuant to [Rule 12(c)] invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

- 4 -

meritorious defense." Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). The statute of limitations is one such "meritorious" defense that a court may consider at this early stage of litigation. See United States v. Kivanc, 714 F.3d 782, 789 (4th Cir. 2013) ("The statute of limitations is an affirmative defense that may be raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim.").

### III. DISCUSSION

A federal court sitting in diversity applies the statute of limitations of the state in which it sits. Gimer v. Jervey, 751 F. Supp. 570, 572 (W.D. Va. 1990). This is an action for breach of contract, and Virginia's statute of limitations for breach of a written contract is five years. Va. Code Ann. § 8.01-246(2) (2014). Virginia law, however, contains a "borrowing" statute that incorporates another state's statute of limitations when that state's substantive law governs the contract:

> No action shall be maintained on any contract which is governed by the law of another state . . . if the right of action thereon is barred either by the laws of such state . . . or of this Commonwealth.

Id. § 8.01-247. The Loan Participation Agreement ("LPA") which governs this dispute states that North Carolina law controls (see Compl. Ex. 1, pg. 3 [ECF No. 1-1]), and North Carolina has a three-year statute of limitations for breach of contract actions, N.C. Gen. Stat. § 1-52(1) (2014). North Carolina's statute of limitations applies to this action, see Hansen v. Stanley Martin Cos., 266 Va. 345, 352 (2003). Neither party disputes this.

Because this lawsuit was filed on March 31, 2014, North Carolina law bars any claim that accured before March 31, 2011. The issue, then, is when River's breach of contract action accrued. The parties believe—and a review of the relevant case law supports the conclusion—

- 5 -

that the courts of North Carolina have spoken with two voices on this subject. For example, in

Jewell v. Price, 264 N.C. 459 (1965), the Supreme Court of North Carolina stated:

> Where there is either a breach of an agreement or a tortious invasion of a right for which the party aggrieved is entitled to recover even nominal damages, the statute of limitations immediately begins to run against the party aggrieved, unless he is under [a statutory disability].

Id. at 461. The North Carolina Court of Appeals has stated—seemingly at odds with the rule in Jewell—that "[i]t is a well-settled rule in North Carolina that a cause of action for breach of contract accrues, and the statute of limitations period begins to run, '[a]s soon as the injury becomes apparent to the claimant or should reasonably become apparent.'" ABL Plumbing & Heating Corp. v. Bladen Cnty. Bd. of Educ., 175 N.C. App. 164, 168 (2005) (quoting Liptrap v. City of High Point, 128 N.C. App. 353, 355 (1998)). Defendants seem to concede that the formation in ABL Plumbing would torpedo its position, since it argues that the North Carolina Court of Appeals' statement "is not an accurate statement of the holdings of the Supreme Court of North Carolina . . . ." (Def.'s Reply pg. 5 [ECF No. 33].)

While statements from the state courts could support either position, it appears Defendant has the better-reasoned position. This is so for two reasons. First, damages are not an element of a breach of contract action under North Carolina law. See Hodges v. Young, Case No. COA10-975, 2011 WL 721009, at *2 (N.C. Ct. App. Mar. 1, 2011) (unpublished) ("Unlike claims of negligence, the existence of damages is not an element of a *prima facie* claim for breach of contract."); McLamb v. T.P. Inc., 173 N.C. App. 586, 588 (2005) ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of [the] contract."); Poor v. Hill, 138 N.C. App. 19, 26 (2000) (same). Thus, in order to initiate an action for breach of contract, a plaintiff need not have suffered any demonstrable damage. See

- 6 -

Reidsville v. Burton, 269 N.C. 206, 211 (1967) ("In no event can a statute of limitations begin to run until plaintiff is entitled to institute action.").

Second, and more importantly, nominal damages are available in a breach of contract action. See Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 363 (1959); Bowen v. Fidelity Bank, 209 N.C. 140, 144 (1936); Sanders v. State Personnel Comm'n, 762 S.E. 2d 850, 858–59 (N.C. App. 2014) (Hunter, J., dissenting); D.G. II, LLC, v. Nix, 213 N.C. App. 220, 235 (2011) (holding that, when the trial court entered partial summary judgment on a breach of contract claim, "plaintiff was entitled to recover nominal damages as a matter of law"); Catoe v. Helms Constr. & Concrete Co., 91 N.C. App. 492, 497–98 (1988) (holding that, where a plaintiff makes out a *prima facie* case of breach of contract but submits no evidence of damages, he is nonetheless entitled to nominal damages); Cole v. Sorie, 41 N.C. App. 485, 490 (1979); Cook v. Lawson, 3 N.C. App. 104, 107 (1968).

When these two statements of law are coupled together, it is clear that a plaintiff is entitled to initiate an action for breach of contract at the time of the breach, and at that point may recover nominal damages. Damages occurring thereafter are irrelevant; "such further damage is only aggravation of the original injury." Pembee Mfg. Corp. v. Cape Fear Constr. Co, 313 N.C. 488, 493 (1985) (citing Matthieu v. Gas Co., 269 N.C. 212 (1967)). Under North Carolina law, "[a] cause of action generally accrues and the statute of limitations begins to run as soon as the right to institute a maintain a suit arises," and "[i]n no event can a statute of limitations begin to run until plaintiff is entitled to institute an action." Penley v. Penley, 314 N.C. 1, 20 (1985). "Once the cause of action has accrued, however, the limitations period begins to run even when the injury suffered at that time is slight." GR&S Atlantic Beach, LLC v. Hull, Case No. 11 CVS 5883, 2012 WL 4850195, at *10 (N.C. Super. Ct. Oct. 10, 2012) (citing Mast v. Sapp, 140 N.C. 533, 533–37 (1906)). Taking all of this into consideration, a breach of contract action accrues

under North Carolina law at the time of the breach because that is the time of the initial—albeit nominal—damage. Accord Thurston Motor Lines, Inc. v. General Motors Corp., 258 N.C. 323, 325–26 (1962) ("'It is a firmly established rule that with certain exceptions . . . the occurrence of an act or omission, whether it is a breach of contract or of duty, whereby one sustains a direct injury, however slight, starts the statute of limitations running against the right to maintain an action. It is sufficient if nominal damages are recoverable for the breach or for the wrong, and it is unimportant that the actual or substantial damage is not discovered or does not occur until later.'" (quoting 34 Am. Jur. Limitation of Actions § 115)).[2]

An examination the facts of Jewell v. Price confirms that it is the breach that triggers the statute of limitations, not the discovery of the injury or the incurring of significant damage from the breach. In Jewell, the plaintiffs sued their former contractor when the furnace he installed malfunctioned and burned down their home. See Jewell, 264 N.C. at 462. The home was delivered on November 15, 1958, and the fire occurred on January 18, 1959. Id. The plaintiffs brought suit on January 12, 1962, more than three years from the date they purchased the home (and furnace), but less than three years from the date of the fire. Id.

---

[2] The North Carolina Court of Appeals' statement in ABL Plumbing "that a cause of action for breach of contract accrues, and the statute of limitations period begins to run, '[a]s soon as the injury becomes apparent to the claimant or should reasonably become apparent,'" ABL Plumbing, 175 N.C. App. at 168 (quoting Liptrap v. City of High Point, 128 N.C. App. 353, 355 (1998)), does not necessarily undercut this conclusion. ABL Plumbing concerned damages sustained by a contractor when the local government agency breached its construction contract. Addressing the two-year statute of limitations, the Court of Appeals concluded, "plaintiff claimed the Board of Education breached its contract with plaintiff as a result of the Board of Education's failure to adequately supervise Sigma. Sigma defaulted on its obligations as general contractor for the project on 1 March 2001. Therefore, any breach of contract arising out of Sigma's actions or omissions should have accrued by 1 March 2001." Id. at 168. On the facts, the Court of Appeals held that the breach of contract action accrued on the date of the breach.
     It is true that the Court of Appeals went on to note that, "the record tends to show that plaintiff was aware of its injury at least by 24 April 2001 when plaintiff submitted its first claim to the Board of Education for damages allegedly suffered as a result of Sigma's default. Accordingly, plaintiff's cause of action for breach of contract accrued at the latest by 24 April 2001." Id. Because the plaintiff filed its suit on April 26, 2003, the most honest reading of the Court of Appeals' opinion is that it was merely pointing out that, even under the more lenient rule, the plaintiff was still "too late to escape the bar of the statute," Jewell v. Price, 264 N.C. 459, 463 (1965).

- 8 -

In holding that the three-year statute of limitations barred the action, the Court stated:

> In this case, defendant's negligent breach of the legal duty arising out of his contractual relation with plaintiffs occurred on November 15, 1958, when he delivered to them a house with a furnace lacking a draft regulator and, also, having been installed too close to combustible joists. . . . Plaintiffs here sustained an invasion of their rights on November 18, 1959, although they had no knowledge of the invasion until the first week in January 1959. The fire which destroyed their home on January 18, 1959, "the whole injury" resulted proximately from defendant's original breach of duty.

Id. at 462 (internal citations omitted). Thus, the North Carolina Supreme Court held that plaintiffs' cause of action "was instituted almost two months too late to escape the bar of the statute." Id. at 463.

Here, the allegations are that, at the time the LPA was signed, the signatures were already forged. Thus, KeySource was immediately in breach of its warranty that "the Loan Documents were validly executed by the Borrower and, where applicable, any Guarantor under the Loan." On the date the LPA was signed, River was entitled to sue KeySource for breach of contract and recover nominal damages. The much more serious damages that came later were "only aggravation of the original injury." Pembee Mfg. Corp., 313 N.C. at 493. Therefore, any claim for a breach of the warranty regarding valid execution of the loan documents must have been brought, if at all, within three years of the date the LPA was signed. River's claim on that allegation is barred by the applicable statute of limitations.

The same is true for the alleged breach of contract arising from the "perfect-and-maintain" warranty. In the LPA, KeySource, whose successor in interest is BNC, warranted that it "has taken, will take, and will continue to take whatever additional actions may be necessary and proper to validly perfect and maintain a Security Interest in the Collateral securing the Loan." (Compl. ¶ 7.) Plaintiff contends this provision imposes a "continuing obligation" on

- 9 -

Defendants, an obligation that can be breached multiple times. "North Carolina law . . . recognizes that some contracts create ongoing obligations which may give rise to numerous breaches of a continuing contractual duty. In such cases, every failure to satisfy an obligation creates a distinct cause of action and carries with it a separate statute of limitations." Northside Pharm., Inc. v. Owens & Minor, Inc., Case No. 88-3059, 1990 WL 27209, at *5 (4th Cir. Feb. 21, 2009) (per curiam) (unpublished).

Defendant argues that, because Plaintiff's damage is traceable to the original failure to provide valid loan documents, the continuing breach theory is inapplicable. They contend that "[i]t is unimportant that the actual or the substantial damage does not occur until later if the whole injury results from the original tortious act." Jewell, 264 N.C. at 461. "[P]roof of actual damages may extend to facts that occur and grow out of the injury, even up to the day of the verdict. If so, it is clear the *damage* is not the cause of the action." Id. at 461–62.

Here, Defendant's duty under both warranties was the same—to provide a valid security interest, which it failed to do. The three-part phrase in the "perfect-and-maintain" warranty—"has taken, will take, and will continue to take"—is a time continuum of past, present, and future. It is not a new, daily warranty, but merely a promise Defendant could breach at any time. Once breached, however, whether in the past, present, or future, the statute of limitations begins to run.

Under the facts alleged in the Complaint, the breach was complete under both warranties when the LPA was signed. This timing of the breach in no way alters the warranty itself. The warranty was to provide a valid security interest, and Defendant failed in that regard. There are no other facts alleged which would change the nature of the warranty. Because the "perfect-and-maintain" warranty was breached only once, and because that breach occurred on the day the

- 10 -

LPA was signed, an action for breach of that warranty is likewise barred by the three-year statute of limitations.

With regard to Count III, the parties dispute whether attorneys' fees are recoverable in this action as a matter of North Carolina law. The parties agree that, "a successful litigant may not recover attorneys' fees . . . unless such a recovery is expressly authorized by statute." Stillwell Enterprises, Inc. v. Interstate Equip. Co., 300 N.C. 286, 289 (1980). North Carolina law, however, permits the recovery of attorneys' fees on "any note, conditional sale contract or other evidence of indebtedness" if certain conditions are met. N.C. Gen. Stat. § 6-21.2 (2014).

"The term 'evidence of indebtedness' as used in [§ 6-21.2] refers to any printed or written instrument signed or otherwise executed by the obligor(s) which evidences on its face a legally enforceable obligation to pay money." W.S. Clark & Sons, Inc. v. Ruiz, 87 N.C. App. 420, 422 (1987) (citing Four Season Homeowners Assoc., Inc. v. Sellers, 72 N.C. App. 189 (1984)). The Supreme Court of North Carolina has held that provisions permitting the recovery of attorneys' fees "should be construed liberally to accomplish the purpose of the Legislature and to bring within it all cases fairly falling within its intended scope." Hicks v. Albertson, 284 N.C. 236, 239 (1973). In Stillwell Enterprises, Inc. v. Interstate Equipment Co., the North Carolina Supreme Court concluded that a lease agreement was an "evidence of indebtedness" because the contract recognized a "legally enforceable obligation by the plaintiff-lessee to remit rental payments to defendant-lessor as they become due, in exchange for the use of the property which is the subject of the lease." Stillwell, 300 N.C. at 294. In United States ex rel. SCCB, Inc. v. P. Browne & Associates, Inc., the Middle District of North Carolina held that a construction subcontract "recognized a legally enforceable obligation by Broadband to remit payments to SCCB as they became due, in exchange for SCCB's construction services. Thus, the subcontract

- 11 -

Case 4:14-cv-00048-JLK-RSB   Document 46   Filed 06/19/15   Page 11 of 14   Pageid#: 459

appears to fall within Stillwell's definition of 'evidence of indebtedness.'" 751 F. Supp. 2d 813, 815 (M.D.N.C. 2010).

Under this expansive definition, the LPA is an "evidence of indebtedness." On its face, it requires:

> Upon receipt of a payment of principal, interest, fees, or other payments under the Loan, or whenever [KeySource] makes an application of funds to the Loan . . . [KeySource] will promptly pay to [River], in U.S. Dollars, an amount equal to [River]'s Participation Interest of each amount received and applied by the [KeySource] in payment of principal, interest on the Loan, shared fees, or other payments in respect of the Loan.

(Compl. Ex. A, pg. 1.) Thus, the LPA is a "written instrument signed or otherwise executed by the obligor(s) which evidences on its face a legally enforceable obligation to pay money." W.S. Clark & Sons, Inc. v. Ruiz, 87 N.C. App. 420, 422 (1987). Like the lease agreement in Stillwell, the LPA is "legally enforceable obligation by [BNC] to remit . . . payments to [River] as they become due, in exchange for the use of the property which is the subject of the [LPA]." Stillwell, 300 N.C. at 294. Like the subcontract in SCCB, the LPA is a "a legally enforceable obligation by [BNC] to remit payments to [River] as they became due, in exchange for [River's] [financial participation] services. Thus, the [LPA] appears to fall within Stillwell's definition of 'evidence of indebtedness.'" SCCB, 751 F. Supp. at 815.

Defendant argues that, because the LPA states that the parties are *not* debtor and creditor, § 6-21.2 does not apply. The statute, however, does not base its applicability on the terms the parties use to refer to themselves. The case law makes clear that it is the nature of the obligation between the parties, and not the terms they choose, which govern the statute's applicability.

Defendant also argues that, by its terms, § 6-21.2 only applies to debts that are "collected by or through an attorney at law *after maturity* . . . ." N.C. Gen. Stat. § 6-21.2. Because the LPA is not the type of debt that "matures," Defendant maintains, section 6-21.2 does not apply. In

- 12 -

Monsanto Co. v. Are-108 Alexander Rd., Judge William Osteen, Jr., noted, "Use of the term 'maturity' suggests a contractual due date." 2014 U.S. Dist. LEXIS 84721, at *13, 2014 WL 2815778, at *5 (M.D.N.C. June 23, 2014). He concluded that, "by definition [and with respect to § 6-21.1], debt 'matures' when a party defaults by missing a scheduled payment." Id. (internal citations and quotations omitted).

Under the LPA, there were no "scheduled due dates." KeySource was obligated to remit payment to River "[u]pon receipt of a payment of principal, interest, fees, or other payments under the Loan, or whenever Origination Institution makes an application of fund to the Loan . . . ." (Compl. Ex. A, pg. 1.) The Complaint does not indicate that KeySource or BNC ever "missed a payment" under the LPA. In fact, there are no facts to suggest that Defendant owes Plaintiff any more under the LPA, because the borrower has defaulted and therefore is *not* making payments. Thus, although the LPA is an "evidence of indebtedness," no debt has "matured" sufficient to invoke N.C. Gen. Stat. § 6-21.1. Therefore, attorneys' fees are not recoverable under North Carolina law. Defendant's Motion for Judgment on the Pleadings will be granted with respect to Count III.

## IV.    CONCLUSION

Plaintiff's claims for breach of contract arising from KeySource's promises that "the Loan Documents were validly executed by Borrower and, where applicable, any Guarantor under the Loan" (Compl. ¶ 7), and that Defendant "has taken, will take, and will continue to take whatever additional actions may be necessary and proper to validly perfect and maintain a Security Interest in the Collateral securing the Loan" (id.), are barred by North Carolina's three-year statute of limitations. Although the LPA *is* an evidence of indebtedness, the debt it encompasses has not "matured" within the meaning of North Carolina law, and thus attorneys' fees are not recoverable in this action. Judgment on the pleadings is appropriate as to Counts I

and III. Because Plaintiff's Motion to Amend the Complaint is still pending before the Court, and because resolution of that motion may affect the applicability of the statute of limitations defense, I will stay imposition of this ruling with regard to Count I until that motion has been addressed.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 19th day of June, 2015.

s/Jackson L. Kiser<br>
SENIOR UNITED STATES DISTRICT JUDGE