IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| RIVER COMMUNITY BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:14-cv-00048 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BANK OF NORTH CAROLINA, | ) | By: Hon. Jackson L. Kiser |
| Successor by merger to KEYSOURCE | ) | Senior United States District Judge |
| COMMERCIAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Bank of North Carolina's Motion for
Summary Judgment. The matter was fully briefed and argued by the parties, and I have
reviewed the evidence and arguments of counsel. This matter is ripe for decision. For the
reasons stated herein, I will grant the motion for summary judgment as to Count II (Breach of the
Implied Covenant of Good Faith and Fair Dealing) but deny it as to Count I (Breach of
Contract/Equitable Estoppel).[1]

I.      **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[2]

Plaintiff River Community Bank, N.A. ("River"), is a national banking association with
its principal place of business in Martinsville, Virginia. Defendant Bank of North Carolina
("BNC") is a North Carolina state-chartered bank with its principal place of business in High
Point, North Carolina. KeySource Commercial Bank ("KeySource") was a North Carolina state-

---

[1] Because I am denying Defendant's motion for summary judgment on equitable estoppel, Plaintiff's
Motion to Strike Defendant's Reply [ECF No. 73] is likely moot. I leave it to Plaintiff to decide whether
to proceed with that motion.

[2] At this stage, the facts are recited in the light most favorable to River Community Bank, N.A., the non-
moving party. All reasonable inferences from those facts are drawn in River Bank's favor. See Scott v.
Harris, 550 U.S. 372, 380 (2007).

chartered bank located in Durham, North Carolina. By virtue of a merger, BNC acquired KeySource on September 14, 2012, and became KeySource's successor in interest.

In 2009, representatives of KeySource called River and inquired whether River would be interested in acquiring an interest in a $3,800,000.00 loan issued by KeySource to Piedmont Center Investments, LLC ("Piedmont"). KeySource forwarded background information regarding the loan to River at its offices in Virginia. After several rounds of negotiation and River's initial refusal to participate, River purchased a 31.5789% interest in the loan to Piedmont. On August 6, 2009, the parties executed a Loan Participation Agreement ("the LPA").

The loan to Piedmont was partially secured with real estate located in Mebane, North Carolina; specifically, a shopping mall that included, among other things, a phone company and a bowling alley. One of the tenants was an entity partially owned by Timothy J. Buckley ("Buckley"). A written guaranty purportedly signed by Buckley, was used to guaranty rent to Piedmont ("the Guaranty"). The Guaranty was assigned to KeySource as further security for the loan to Piedmont.

As part of the agreement between KeySource and River, KeySource represented and warranted that "the Loan Documents were validly executed by Borrower and, where applicable, any Guarantor under the Loan," and that KeySource "has taken, will take, and will continue to take whatever additional actions may be necessary and proper to validly perfect and maintain a Security Interest in the Collateral securing the Loan." In deciding to purchase an interest in the loan to Piedmont, River relied on KeySource's representations in the LPA. River ultimately delivered $1,200,000.00 to KeySource for its interest in the loan.

In April 2011, River first received information indicating that Buckley's signature had been forged on the loan documents. Roy Haga ("Haga"), one of KeySource's representatives,

represented to River that the Guaranty and Assignment were validly executed. River encouraged KeySource to file suit against Buckley, the supposed Guarantor, to enforce the loan. KeySource filed suit against Buckley once the loan went into default.

In actuality, Buckley's signatures on both the Guaranty and the Assignment of the Guaranty were forgeries by Roger Camp ("Camp"), one of Piedmont's owners. In June of 2011, Camp was indicted for crimes including bank fraud, and for his role in fraudulently inducing KeySource to issue the loan to Piedmont. Camp eventually pleaded guilty to all charges, and KeySource dropped its suit against Buckley.

On or about June 23, 2011, representatives of River and KeySource planned how they would move forward. According to River, during that conversation, the parties spoke about an appraisal on Piedmont's real property and BNC offered an appraisal that valued the property around $5.3 million. According to Ellen Wood, a River employee, "[g]iven the appraised value, Don [Draughon] expect[ed] that KeySource and [River] would be made whole." [ECF No. 68-8.] KeySource also indicated that the phone company was "paying rent sufficient to pay the loan." (Decl. of Ronald Haley ¶ 22, Aug. 10, 2015 [ECF No. 68-1].) Further, KeySource indicated that it could generate income by leasing out the bowling center.

Around this time, KeySource settled with another Piedmont creditor to purchase the personal property located in the bowling alley. KeySource paid $200,000.00 for the bowling equipment, which it asserts made the property more marketable, especially to a buyer hoping to operate a bowling alley on the premises. River was aware of the purchase but not the price.

KeySource recommended a "prepackaged" bankruptcy for the Piedmont property. On August 11, 2011, Piedmont filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. In its petition, Piedmont valued the collateral associated with the Piedmont

loan at $5.2 million. The bankruptcy court lifted the automatic stay and permitted KeySource to move forward with foreclosure proceedings.

Following Camp's indictment, River requested that KeySource repurchase River's participation in the loan. On September 14, 2011, Draughon e-mailed Ronald Haley ("Haley"), River's President and CEO, and stated: "[KeySource] do[es] not believe that the [LPA] would give [River] the right to put back the participated portion of the note. Sorry, I know this is unfortunate for both institutions." (Decl. of Donald Draughon Ex. 1, July 23, 2015 [ECF No. 58].) Once Camp entered a guilty plea in April 2012, River again demanded that KeySource repurchase its share of the loan.

The Piedmont property did not sell for the value stated in KeySource's appraisal ($5.3 million). In the spring of 2013, "[a]fter being pressed by a representative of Bank of North Carolina" (Decl. of Ronald Haley ¶ 25, Aug. 10, 2015 [ECF No. 68-1]), Haley agreed, on River's behalf, to a sales price of $1 million—over $4 million less than what KeySource had previously asserted the property was worth.[3]

At the conclusion of the sale, BNC unilaterally deducted the entire cost of the business personal property ($200,000.00) from the sales price. Although the contract for sale did not allocate any of the purchase price for the business personal property, it did state, "The sale shall include all bowling and restaurant-related fixtures, equipment and personal property . . . ." [ECF No. 68-6.] River claims it did not learn of BNC's intentions until after the closing. After deductions for BNC's fees and expenses, and after BNC's allocation of $200,000.00 of the sales

---

[3] In its brief, River asserts that it "agreed to the sale with the understanding that it would receive its 31.5789% of the full $1 million purchase price (after deduction for BNC['s] reasonable expenses of carrying and marketing the property)." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. pg. 8, Aug. 10, 2015 [ECF No. 68].) The Record does not support that contention. The evidence cited to support this statement does not establish anything about River's considerations when it decided to agree to the sale price.

- 4 -

proceeds to pay for the business personal property, River received only $89,387.85 from the proceeds of the property sale.

On March 31, 2014, River filed suit against BNC in state court, alleging that KeySource/BNC breached the warranties of the Agreement (Count I) and breached the implied duties of good faith and fair dealing (Count II). River also sought attorney's fees and costs (Count III). On October 24, 2014, BNC removed the action to this Court. On October 31, 2014, BNC filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction or, in the alternative, motion to transfer. I denied that motion on December 18, 2014. On February 18, 2015, BNC filed a Motion for Partial Judgment on the Pleadings, pursuant to Rule 12(c). After mediation was unsuccessful, I granted that motion in part. I entered judgment for BNC on Count III, but stayed imposition of the ruling as to Count I to allow for an adequate assessment of River's claim that equitable estoppel barred BNC's statute of limitations defense. River filed an Amended Complaint, which added facts it contended equitably estopped BNC from asserting the statute of limitations and added a new count, negligent misrepresentation (Count IV). BNC has now moved for summary judgment on Count II and River's equitable estoppel argument.[4]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues are primarily legal rather than factual" in nature. Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

---

[4] Plaintiff withdrew its negligent misrepresentation claim on July 6, 2015. (See Pl.'s Reply Br. in Supp. of its Mot. to Amend Compl. pg. 1 n.1, July 6, 2015 [ECF No. 53].)

A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citation omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To determine whether a genuine dispute exists, the Court must look to the quantum of proof applicable to the claim rather than a mere scintilla of evidence in the nonmovant's favor. Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson, 477 U.S. at 249−50, 254. A fact is material where it might affect the outcome of the case in light of the controlling law. Anderson, 477 U.S. at 248. On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute over them. Scott, 550 U.S. at 380. At this stage, however, the Court's role is not to weigh the evidence but simply to determine whether a genuine dispute exists for trial. Anderson, 477 U.S. at 249.

## III.  DISCUSSION

### A.  Count I: Equitable Estoppel

"The doctrine of equitable estoppel is based on an application of the golden rule to the everyday affairs of men. It requires that one should do unto others as, in equity and good conscience, he would have them do unto him, if their positions were reversed. Its compulsion is one of fair play." McNeely v. Walters, 211 N.C. 112, 113 (1937) (citation omitted). Under North Carolina law, "[e]quitable estoppel may be invoked, in a proper case, to bar a defendant from relying upon the statute of limitations." Duke Univ. v. Stainback, 320 N.C. 337, 341 (1987) (citing Nowell v. Tea Co., 250 N.C. 575 (1959)). "Actual fraud, bad faith, or an intent to mislead or deceive is not essential to invoke the equitable doctrine of estoppel." Stainback, 320 N.C. at 341 (citing Watkins v. Motor Lines, 279 N.C. 132 (1971)); see Aikens v. Ingram, 524 F. App'x 873, 882 (4th Cir. 2013) (per curiam) (unpublished). If a defendant's representations

- 6 -

mislead a plaintiff, "who acts upon them in good faith, to the extent that he fails to commence his action in time, estoppel may arise." Id.

> The tolling of the statute may arise from the honest but entirely erroneous expression of opinion as to some significant legal fact. Equity will deny the right to assert the defense of the statute of limitations when delay has been induced by acts, representations, or conduct, the repudiation of which would amount to a breach of good faith.

Id. (citing Nowell, 250 N.C. at 575).

The North Carolina courts have articulated the elements of equitable estoppel as follows:

> (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

White v. Consol. Planning, Inc., 166 N.C. App. 283, 305 (2004) (quoting Friedland v. Gales, 131 N.C. App. 802, 807 (1998)); see also In re Will of Covington, 252 N.C. 546, 549 (1960); Parker v. Thompson–Arthur Paving Co., 100 N.C. App. 367, 370 (1990).

Importantly, the first element—conduct amounting to a false representation or concealment of material facts—has alternatively been articulated as "[c]onduct . . . which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert." Hawkins v. M & J Fin. Corp., 238 N.C. 174, 177 (1953). Further, "[a] party may be estopped to deny representations made when he had no knowledge of their falsity, or which he made without any intent to deceive the party now setting up the estoppel. The fraud consists in the inconsistent position subsequently taken, rather than in the original conduct." Hamilton v. Hamilton, 296 N.C. 574, 576 (1979) (citation, quotation marks, ellipsis, and brackets omitted). Under this expression of equitable estoppel,

"[i]t is the subsequent inconsistent position, and not the original conduct that operates to the injury of the other party." Id. at 576–77 (internal quotation marks and citation omitted).

Primarily, the doctrine turns on a consideration of "the balances of equity," which is dependent on the facts of each case. Miller v. Talton, 112 N.C. App. 484, 488 (1993) (citation omitted). "If the evidence in a particular case raises a permissible inference that the elements of equitable estoppel are present, but other inferences may be drawn from contrary evidence, estoppel is a question of fact for the [factfinder]." Id. (citations omitted).

In the present case, River invokes two factual assertions that it contends estop BNC from asserting the statute of limitations; first, that the loan documents were "validly executed," and second, that River would be "made whole."

The "made whole" assertion is sufficient to send the question of equitable estoppel to a trial.[5] This assertion is strikingly similar to one held to warrant estoppel in Stainback. In that case, a nine-year-old boy was admitted to Duke Hospital for treatment. Stainback, 320 N.C. at 338. The boy's father, the defendant Stainback, was "legally responsible for his son's medical expenses, and he also signed a written agreement accepting personal responsibility for these costs." Id. Stainback's insurance company denied coverage, and Stainback brought suit against the insurance company. Id. Stainback won, and the judgment was satisfied by a check payable to Stainback and his attorney. Id.

Duke subsequently sued Stainback for the outstanding medical bills. Id. at 339. The trial judge found that, during the pendency of Stainback's suit against the insurance company, Stainback's attorney told Duke that he was attempting to get the insurance company to pay and

---

[5] Because the "made whole" assertion is sufficient to send the question of equitable estoppel to trial, it is not necessary to delve into the "valid execution" argument in depth.

- 8 -

would keep Duke updated.  Id.  Duke made no effort to intervene in Stainback's suit.  Id.
Ultimately, the Supreme Court of North Carolina held:

> The actions and statement of Stainback's attorney caused Duke to
> reasonably believe that it would receive its payment for services
> rendered once the case between Stainback and [the insurance
> company] was concluded, and such belief reasonably caused Duke
> to forego pursuing its legal remedy against Stainback.  The actions
> and statements of Stainback lulled Duke into a false sense of
> security.

Id.

Here, taking the facts in the light most favorable to River, BNC's statements "lulled
[River] into a false sense of security."  Id.  Without regard to whether the statement was true, and
assuming that BNC made it in good faith, the statement that BNC expected the parties to be
"made whole" is the type of statement that would cause a party to "reasonably believe that it
would receive its payment . . . , [and] reasonably cause[] [a party] to forego pursuing its legal
remed[ies] . . . ."  Id.  Dispositively, according to Haley, "[b]ecause KeySource led [him] and
River Bank to believe that the loan was adequately supported, River Bank did not bring suit."
(Haley Decl. ¶ 23, Aug. 10, 2015 [ECF No. 68-1].)

Under the elements of equitable estoppel as announced in White, application of the
doctrine is appropriate.  As to BNC, its statement that River would be "made whole" is a fact that
is "inconsistent with[] those which the party afterwards attempts to assert."  In re Will of
Covington, 252 N.C. at 549.  The statement was made with an intention that River would act on
it; clearly, it was meant to assuage River's fears about taking a massive loss on the loan
participation.  See White, 166 N.C. App. at 305.  Finally, BNC knew of the real facts but stated
an "honest but entirely erroneous expression of opinion as to some significant legal fact."
Stainback, 320 N.C. at 341.  As to River, it was without full knowledge of the facts as its only

- 9 -

source of certain information was BNC. Haley explicitly stated that River relied on BNC's representations, and River changed its position prejudicially. See Covington, 252 N.C. at 549.[6]

BNC attempts to avoid this conclusion with three ultimately unpersuasive arguments. First, it argues that, because damages are not an element of a breach of contract action, any misstatement regarding the potential for recovery is immaterial. That argument overstates the rule. Stainback does not require an erroneous assertion of an *element of a cause of action*; it only requires an "erroneous expression of opinion as to some *significant legal fact*." Stainback, 320 N.C. at 341 (emphasis added). Certainly, whether a party would suffer any loss is "significant" to its decision whether to endure the time, burden, and expense of a trial.

Next, BNC conflates the two estoppel arguments ("valid execution" and "made whole") to avoid them both. It argues, "These assertions [regarding the phone company and possibly leasing the bowling center], supported by no evidence other than Mr. Haley's Declaration are beside the point. They do nothing to show that Plaintiff did not know or lacked the means to know that the signatures were forged." (Def.'s Reply Br. pg. 11, Aug. 20, 2015 [ECF No. 72].) BNC's representations about whether River would be "made whole" need not address whether the loan documents were validly executed. If the "made whole" assertion caused River to delay filing suit (as Haley explicitly stated that it did), then estoppel is warranted.

Finally, BNC maintains that other factors motivated River's decision to delay filing suit. Specifically, BNC asserts that River wanted to wait for other participation loans with KeySource to close because a lawsuit would sour potential deals with BNC. Also, BNC states that River wanted to determine what loss, if any, it would suffer on the sale of the property. To be fair, the

---

[6] The truth was only made clear to River once it was informed of the much lower appraisal in April of 2012. The statute of limitations' clock was reset at that time. See Nowell v. Great Atl. & Pac. Tea Co., 250 N.C. 575, 579 (1959) (citing Smith v. Gordon, 204 N.C. 695 (1933)). Plaintiff brought suit in state court on March 31, 2014, within the three-year statute of limitations.

Case 4:14-cv-00048-JLK-RSB   Document 86   Filed 09/11/15   Page 10 of 14   Pageid#: 1309

Record does contain evidence that supports this argument. According to the July 31, 2011, credit report, "[River] plans on commencing this process [the lawsuit] once another credit participated with KeySource is closed." (Decl. of Benjamin Norman Ex. G, Aug. 20, 2015 [ECF No. 72-8].) Likewise, River's attorney[7] wrote in a March 27, 2012, e-mail: "River Bank is still assessing whether to pursue legal action against KeySource Bank. Ideally, River Community Bank would prefer to wait until after the property has been sold so that it can determine whether there in fact is a loss and, if so, the amount of that loss." (Id. Ex. H [ECF No. 72-9].) Haley's declaration, however, states unequivocally that it was BNC's assurance that River would be "made whole," which caused its delay in filing suit. The evidence conflicts as to River's actual motivations for the delay. At this stage, Haley's declaration must be accepted as true. The Record creates a genuine issue of material fact as to whether Haley's declaration is completely accurate. Thus, this issue is inappropriate for summary judgment.

River's awareness that BNC knew the LPA did not give River "the right to put back the participated portion of the note" is irrelevant to the "made whole" assertion. (See Decl. of Donald Draughon ¶¶ 4–9, July 23, 2015 [ECF No. 58].) River does not argue that BNC said it would be "made whole" by being permitted to withdraw from the LPA; rather, it contends that Draughon assured River that it would be "made whole" from the proceeds following the foreclosure. This is an entirely separate issue from whether BNC would permit River to withdraw its participation in the LPA.

Taking the facts in the light most favorable to River, BNC's statement that River would be "made whole" reasonably caused River to delay filing suit, and the statute of limitations should be equitably tolled. A factfinder, upon hearing all of the facts and weighing them accordingly, may conclude, given its knowledge of the appraisal values, that River's position

_____

[7] This assumes that River's attorney can speak to River's motivation.

was not reasonable and that the statute of limitations should not be tolled. At this stage, however, it is a question for the factfinder.

   B. <u>Count II: Implied Duty of Good Faith and Fair Dealing</u>

   "In addition to its express terms, a contract contains all terms that are necessarily implied 'to effect the intention of the parties' and which are not in conflict with the express terms." <u>Maglione v. Aegis Family Health Ctrs.</u>, 168 N.C. App. 49, 56 (2005) (quoting <u>Lane v. Scarborough</u>, 284 N.C. 407, 410 (1973)). "Among these implied terms is the 'basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement.'" <u>Id.</u> (quoting <u>Weyerhaeuser Co. v. Godwin Bldg. Supply Co.</u>, 40 N.C. App. 743, 746 (1979)). "All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." <u>Id.</u>

   Plaintiff contends:

> [BNC's] actions in unilaterally allocating $200,000.00 of the purchase price to the business personal property . . . constitute[d] a breach of the implied covenant of good faith and fair dealing, in that [BNC] acted unilaterally to benefit itself and to injury [*sic*] River Bank by depriving River Bank of a portion of the benefits of its agreement.

(Am. Compl. ¶ 50 [ECF No. 67].) The facts taken in the light most favorable to River, however, do not establish a breach of the implied covenant of good faith and fair dealing.

   First, the Record establishes that River was aware of the purchase of the business personal property. Haga e-mailed Haley and informed him of the possible asset purchase, stating, "It might make sense for [River] to become involved in this asset purchase, but you and I can discuss the merits of this once we know the resolution." [ECF No. 72-10.] Haley replied

- 12 -

and approved of the sale, remarking to Haga that, "once [the asset purchase] is complete, [we] should be able to move forward with an ongoing, fully equipped business with a more reasonable value than the prior evaluation." [ECF No. 72-10.] Second, River was well aware that the bowling equipment was included in the sale of the property. The sale documents submitted to River prior to the closing clearly stated that the bowling equipment was included. [See ECF No. 68-6.] Finally, River was aware that BNC had shouldered the entire cost of the bowling equipment. It was only proper that it be reimbursed for its expenses—which the LPA expressly countenanced. [See ECF No. 68-4.] Thus, River's claim that it was unaware of BNC's decisions is only supported by a showing of River's willful ignorance of readily available facts. River was well aware of what BNC was doing and acquiesced at every step of the process. Such a course of conduct does not violate the covenant of good faith and fair dealing.

Moreover, the Record shows that BNC went beyond its contractual obligations by soliciting River's advice with regard to the asset purchase [see ECF No. 72-10] and the sales price [see ECF No. 68-5]. While the LPA required BNC to "use reasonable efforts to consult with [River] regarding the actions to be taken in response to a default under the Loan Documents," BNC was not "bound by [River's] counsel and [was] entitled to take whatever action it deem[ed] appropriate to enforce the rights and remedies accruing on account of such default." [ECF No. 68-4.] Although BNC had no obligation to seek River's agreement, it did. River willingly gave that consent and now complains that it was duped. The Record simply does not support that argument, and summary judgment is appropriate on Count II.

## IV.  CONCLUSION

Because a factfinder could conclude that River reasonably relied on BNC's assertion that it would be "made whole," summary judgment is not appropriate on River's claim of equitable estoppel. Summary judgment is appropriate on Count II, however, because the Record

- 13 -

establishes that River was aware of BNC's actions regarding the asset purchase and the property sale and acquiesced to BNC's actions. BNC's actions did not violate the covenant of good faith and fair dealing.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 11th day of September, 2015.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE